**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARL HEMPHILL, and MJC LABOR** | : | |
| **SOLUTIONS, LLC,** | : | **CIVIL ACTION** |
| | : | **No. 19-5260** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LANDMARK INSURANCE COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |

**McHUGH, J.**                                                    **July 9, 2020**

**MEMORANDUM**

This is a declaratory judgment action where the issue is whether an insurer has a duty to defend its insured against a lawsuit brought by a former employee. The insurance policy at issue covers the insured for claims "arising out of a negligent act, error or omission . . . in the performance of providing a permanent and/or temporary employee placement services," and the employee's underlying allegations, pending in a separate action before this Court, allege human trafficking and wage violations.  The insurer has moved to dismiss.  Having reviewed the provisions of the policy and the allegations of the underlying complaint, I conclude that coverage for these claims falls outside the scope of the policy.  The motion to dismiss must therefore be granted.

I.      **Background**

   A.  **Hemphill and MJC Labor extend coverage under the MPL Policy**

Carl Hemphill and MJC Labor Solutions, LLC, Plaintiffs here, purchased from Landmark Insurance Company, Defendant here, a Miscellaneous Professional Liability Coverage policy

("MPL policy"), effective from August 26, 2015, to the same day the following year.  ECF 15-2, at 4.  As the coverage period ended, Hemphill and MJC Labor purchased "tail coverage" under the MPL policy, extending it for another two years.  *Id.* at 2.

Defendant Landmark does not contest that the MPL policy was active during the period relevant to this case, nor does it contest that Mr. Hemphill qualifies as an insured person with respect to the professional services he provided on behalf of MJC Labor.[1]  ECF 15, at 11.  The policy provides that "[Landmark] will pay on behalf of the Insured, as shown in the Declarations, all sums that the Insured becomes legally obligated to pay as **Damages** and associated **Claim Expenses** arising out of a negligent act, error or omission . . . even if the Claim asserted is groundless, false or fraudulent, in the rendering of or failure to render professional services as described in the Declarations."  ECF 15-2, at 6 (emphases in original).  On the policy's declarations page, MJC Labor's "professional services" are defined as "solely in the performance of providing a permanent and/or temporary employee placement services and/or visa application process services for others for a fee."  ECF 15-2, at 4.  Taking these provisions together, Landmark promised to cover MJC Labor and Hemphill for claims "arising out of a negligent act, error or omission . . . in the performance of providing a permanent and/or temporary employee placement services."  No other provision of the MPL policy is relevant to this case.

### B.  Castillo files the Underlying Complaint

While the MPL policy was in force, on May 1, 2018, Jose Enrique Castillo Chaidez filed suit against Carl Hemphill, MJC Labor, and various other corporate entities controlled by

---

[1] The MPL policy is between MJC Labor and Landmark alone, *see* ECF 15-2, at 4, but it extended insured status to "[a]ny present or former principal, partner, officer, director, or employee of the Named Insured, but only as respects professional services rendered on behalf of the Named Insured."  *Id.* at 7.  Landmark does not dispute that Mr. Hemphill qualifies as an insured person under that provision.

Hemphill.  *See* Complaint, *Jose Enrique Castillo Chaidez v. Carl Hemphill, et al.*, No. 18-1837 (E.D. Pa. May 1, 2018), ECF 2 (hereinafter the "Underlying Complaint").  In the Underlying Complaint, Mr. Castillo alleged that Hemphill and his corporate entities forced him to undertake activities well beyond the scope of his agreed upon job responsibilities, withheld money to which he was entitled, lodged him in overcrowded and unsanitary housing, and threatened him with arrest and permanent expulsion from a temporary-worker visa program if he refused to acquiesce to those conditions.

As relevant here, the Underlying Complaint pled nine causes of action against Hemphill and MJC Labor.[2]  The causes of action fall into four categories—violations of federal and state anti-human trafficking laws; violations of federal and state wage laws; violations of Pennsylvania common law; and a violation of Pennsylvania consumer protection law.  Specifically, in the Underlying Complaint, Mr. Castillo stated causes of action under the federal Trafficking Victims Protection Act, the Fair Labor Standards Act, Pennsylvania Act 105 (the state's anti-human trafficking law), the Pennsylvania Minimum Wage Act of 1968, the Pennsylvania Wage Payment and Collection Law, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law.  The Underlying Complaint also alleged Pennsylvania common law causes of action for breach of contract and unjust enrichment.

---

[2] Mr. Castillo in the Underlying Complaint pled eleven causes of action, but two involve allegations against actors not covered by the MPL policy.  Count II alleges a violation of the federal Trafficking Victims Protection Act, 18 U.S.C. § 1581, *et seq.*  It claims that certain corporate Defendants controlled by Hemphill but not parties to the MPL policy at issue here "knowingly benefited from participation in Defendant Employers' venture to subject [Castillo] to forced labor, knowing or in reckless disregard of the fact that Employer Defendants' venture engaged in the providing or obtaining of labor or services through threats of serious harm, coercion, and abuse of the legal process." ECF 15-1, at 29.  Count V alleges a violation of Pennsylvania Act 105, 18 Pa. C.S. § 3051, the state's anti-human trafficking law.  It claims that that certain corporate Defendants controlled by Hemphill but not parties to the MPL policy at issue here "knowingly subjected Plaintiff to labor servitude" through various schemes and "knowingly benefitted financially and received the value of [Castillo's] trafficking—namely, his labor and services."  *Id.* at 32.

### C.  Landmark declines to defend Hemphill and MJC Labor

Once sued, Hemphill sent the Underlying Complaint to his insurance broker, who forwarded it to Landmark.  Following a review of the allegations, Landmark declined to defend Hemphill or MJC Labor in the Castillo action.  In its declination letter, Landmark explained that the Underlying Complaint did not allege negligent acts, errors, or omissions in the provision of placement services, as the MPL Policy required.  *See* ECF 15, at 1.  Instead, Landmark took the position that the Underlying Complaint alleged wrongful conduct by Hemphill or MJC Labor after Castillo's employment placement and during his employment thereby falling outside coverage.

### D.  Hemphill and MJC Labor file declaratory judgment action

In response to Landmark's decision not to defend, Plaintiffs Hemphill and MJC Labor filed an action in this Court seeking a declaration that Landmark was obliged to defend them in the Underlying Action and reimburse them for their attorneys' fees and costs.  Landmark has moved to dismiss Plaintiffs' Declaratory Judgment Complaint, arguing that its duty to defend was never triggered.

To determine whether the allegations in the Underlying Complaint should have triggered coverage under the MPL policy necessarily requires a thorough understanding of those allegations.  The case instigated by the Underlying Complaint also is before me, and I have dealt with certain dispositive issues in that case already.  *See, e.g.*, Memorandum Denying Defendants' Motion for Summary Judgment, *Jose Enrique Castillo Chaidez v. Carl Hemphill, et al.*, No. 18-1837 (E.D. Pa. Nov. 15, 2019), ECF 35.  But the factual recitation contained in that opinion is rather limited because the legal issues requiring resolution were correspondingly narrow.  Here, however, because the question is whether *any* of the allegations made in the underlying action

4

triggered coverage under the MPL policy, I must investigate the allegations in the Underlying Complaint in detail.

Structurally, the opinion will proceed as follows.  First, I will review the legal standard governing an insurer's duty to defend.  Second, I will summarize the allegations in the Underlying Complaint and the factual material supporting them.  Third, from those pleaded causes of action, I will examine if there is any possibility that Plaintiffs' coverage has been triggered by allegations in the Underlying Complaint.  Fourth, I will analyze Plaintiffs' argument that the "nature" of Castillo's allegations is a claim of negligent misrepresentation, even though Castillo did not plead such a claim.  Fifth, and finally, I will examine Plaintiffs' argument that they had a reasonable expectation of defense in in the Castillo Action under the MPL policy because Landmark defended them in a similar, previous action.

## II.    Governing Legal Standard[3]

The MPL policy at issue here does not contain a forum selection clause.  So preliminarily I must determine which state's law should apply to this action.  Neither party has addressed the issue, but I assume from their sustained discussion of Pennsylvania insurance and contract law that they mean for Pennsylvania law to govern.

Where federal court jurisdiction is based on diversity of citizenship, as it is here, the district court must apply the choice of law rules of the state in which it sits.  This Court sits in Pennsylvania.  Pennsylvania conflict of laws principles dictate that an insurance contract is guided by the law of the state in which it was made.  *Crawford v. Manhattan Life Ins. Co.*, 221

---

[3] In this Circuit, motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) are governed by the well-established standard set forth in *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

A.2d 877, 880 (Pa. Super. Ct. 1966).  The place of making an insurance contract is the place of delivery.  *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 745-46 (3d Cir. 1999).  In the absence of proof as to the place of delivery, there is a presumption of delivery at the residence of the insured.  *Crawford*, 221 A.2d at 881 (citation omitted).  Here, Hemphill and MJC Labor were residents of Pennsylvania when the policy was issued.  Thus, I presume the MPL policy was made and delivered in Pennsylvania and will construe the terms of the policy pursuant to Pennsylvania law.

Under Pennsylvania law, courts decide whether a duty to defend exists by, first, reviewing the language of the insurance policy to determine when it provides coverage, and second, by then examining the complaint filed against the insured to determine whether its allegations "constitute the type of instances that will trigger coverage."  *Lenick Constr., Inc. v. Selective Way Ins. Co.*, 737 F. App'x 92, 94 (3d Cir. 2018) (quoting *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 896-97 (Pa. 2006)).  "If the complaint filed against the insured avers facts which would support a recovery that is covered by the policy, it is the duty of the insurer to defend until such time as the claim is confined to a recovery that the policy does not cover."  *Id.* (citation omitted) (quoting *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987)).

In reviewing the complaint filed against the insured, "[i]t is well-settled that it is the nature of the allegations themselves, not the particular cause of action that is pled in the complaint that determines whether coverage has been triggered."  *J.J.D. Urethane Co. v. Westfield Ins. Co.*, 2018 WL 796428, at *5 (Pa. Super. Ct. Feb. 9, 2018) (citing *Mutual Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999)).  But courts may not stray outside the four corners of the underlying complaint or consider extrinsic evidence.  *Kvaerner*, 908 A.2d at 896.

6

Instead, "an insurer's duty to defend and indemnify [is] determined *solely* from the language of the complaint against the insured." *Id.* (emphasis added); *State Farm Fire & Cas. Co. v. DeCoster*, 67 A.3d 40, 45-46 (Pa. Super. Ct. 2013).

"In determining the existence of a duty to defend, the factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured." *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591, 595-96 (3d Cir. 2009) (citation omitted). "[A]n insurer has a duty to defend if there is any possibility that its coverage has been triggered by allegations in the underlying complaint." *See Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 674 (3d Cir. 2016) (citing *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010)). "Accordingly, it is the potential, rather than the certainty, of a claim falling within the insurance policy that triggers the insurer's duty to defend." *Am. & Foreign Ins. Co.*, 2 A.3d at 541.

## III.    Allegations in the Underlying Complaint

Because the governing legal standard dictates that "the factual allegations of the underlying complaint against the insured are to be taken as true," *Nationwide*, 562 F.3d at 595-96, I will describe the Underlying Complaint with little deviation from what Mr. Castillo alleged. *See generally* Underlying Complaint, *Jose Enrique Castillo Chaidez v. Carl Hemphill, et al.*, No. 18-1837 (E.D. Pa. May 1, 2018), ECF 2.

In late 2014 or early 2015, Jose Enrique Castillo Chaidez attended a job fair sponsored by the *Servicio Nacional de Empleo Sinaloa*, a government employment agency in his home state of Sinaloa, Mexico. Through the job fair, sometime around February 2015, Castillo interviewed at *Servicio Nacional* with Carl Hemphill. Hemphill told Castillo he owned a trucking company

called KAH Transportes, which needed drivers to transport mulch and other landscaping materials.

KAH Transportes subsequently hired Castillo and, on February 18, 2015, at the offices of *Servicio Nacional*, Castillo signed an employment contract with KAH Transportes. At the same time, Castillo signed a contract to rent housing from Hemphill for $250 per month. In Castillo's employment contract with KAH Transportes, the parties agreed as follows:

- **Castillo's employment term was** set to run from March 5, 2015, through December 23, 2015.
- **Castillo's salary was** set at $20.89 per hour "for the services of the employee" and $31.24 per hour for overtime.
- **Castillo's work schedule was** agreed to be "from 5:00 a.m. to 2:00 p.m. with a half hour for lunch and with an approximate[] total of 35 to 40 hours per week," with "days when you have to work at night and on weekends."
- **Castillo's tasks and position were** defined to include "driving cargo trucks," "check[ing] daily that truck is in perfect condition," carrying material "according to the season such as: mulch, ground leaf, organic fertilizer, soil (topsoil), firewood and other products."
- **Castillo reported to** the "Bilingual Manager, President and Manager of the Office," and was "an employee of [KAH Transportes] and only [KAH Transportes] [was] authorized to supervise or control the Employee."

According to the Underlying Complaint, once Castillo signed the employment contract, Hemphill informed Castillo "that he was now a contracted worker [with KAH Transportes] and could not accept other employment." Underlying Complaint ¶ 92.

On March 9, 2015, Castillo attended an interview at the U.S. consulate in Hermosillo, a city in the northwestern Mexican state of Sonora. He was issued an H-2B work visa the next day, which allowed him to work as a truck driver for KAH Transportes from March 10, 2015, until December 23, 2015. While Castillo expected to leave for the United States the next day, he

did not arrive in the United States until April 19, 2015.[4]  On that day, Castillo was admitted to the United States pursuant to his H-2B temporary visa to work for KAH Transportes.  Hemphill retrieved Castillo from Philadelphia International Airport and shuttled him to his company's offices in Upper Darby, Pennsylvania.  Castillo signed paperwork, and Mariana Hemphill—Hemphill's wife and business partner—confiscated Castillo's passport and returned to him a photocopy to carry.

Hemphill then drove Castillo to his housing in West Philadelphia.  According to the Underlying Complaint, the "apartment was filthy and had a bad odor."  Underlying Complaint ¶ 135.  Six men, each a foreign national who worked for Hemphill and Hemphill's companies, paid to share the apartment.  The next morning, "Castillo woke up with bed bug bites," and, "[w]hen he went to the kitchen to make coffee, rats ran off of the counters."  Underlying Complaint ¶ 139.

That morning, Castillo walked from West Philadelphia to Hemphill's offices in Upper Darby.  Mariana Hemphill drove Castillo to a local Social Security Administration office to apply for a Social Security Number.  Mariana Hemphill had with her Castillo's passport and allegedly kept it when she and Castillo returned to the office.  When they returned to Hemphill's offices, Hemphill told Castillo that he could not officially work until his Social Security Number arrived at the office.

---

[4] While Castillo waited, Castillo purportedly contacted Hemphill several times to inquire as to the start date of his employment.  Hemphill (or some agent of Hemphill) told him that his start date was delayed due to certain weather conditions in the Philadelphia area.  While waiting for Hemphill and KAH Transportes to allow him to begin work, Castillo did not work in Mexico.  He also declined a job offer from another U.S.-based company that had interviewed Castillo for an H-2B truck driving position.  Castillo informed that company that he had signed a contract with another company and therefore was barred from accepting the offer.

Castillo remained at the company's offices.  Office staff showed Castillo around the offices, shop, and yards, and another staff member picked up Castillo in a tractor-trailer and drove him around the area to orient him to his new routes and duties.  Once back, office staff directed Castillo to work around the company's yard.  Castillo picked trash out of yard debris, which Hemphill's companies would later grind into wood chips.  Castillo continued to work in this manner for the next several days.

On Thursday, April 23, 2015—four days after Castillo arrived in Philadelphia—Castillo's social security card arrived, and he began work for KAH Transportes.  (Like his passport, some agent of Hemphill retained Castillo's social security card.)  For the next two weeks, Castillo alleges that he worked thirteen to fourteen hours per day, seven days per week.  Castillo's duties principally consisted of transporting shredded wood to a processing plant, which was processed into finished mulch, and then transporting the finished mulch back to Hemphill's offices in Upper Darby so that Hemphill could sell it to the public.

The Complaint further alleges that soon after beginning work with KAH Transportes, Castillo was told that he would not be paid for three weeks.  Castillo also was informed that it was KAH Transportes' practice to hold a worker's first week of pay until the end of the season as a type of security deposit.  During that period, Castillo's roommates informed him that Hemphill brought workers from Mexico, Guatemala, and El Salvador to the United States on H-2B visas to do landscaping work for Hemphill and that Hemphill made money by "renting" the workers to other companies to perform landscaping work and other labor.

Castillo was not paid until Friday, May 15, 2015.  When he was paid, Castillo was issued two paychecks for the pay periods between April 23 and May 6.  But Castillo was not paid for any of the work performed on April 20, April 21, or April 22.  Nor was he paid for all of the

10

hours he worked between April 23 and May 6.  Further, KAH Transportes deducted rent for April and May.  Around mid-May, Castillo asked Hemphill why his paychecks were missing more than half of the pay he was owed.  Mr. Hemphill told Castillo that he would be paid the rest in cash at a later date.

Beginning in early May 2015, Hemphill and KAH Transportes began to reduce Castillo's driving assignments and instead began to assign him office and yard work at Hemphill's Upper Darby office.  Around the same time, Hemphill attempted multiple times to send Castillo to do work for construction companies.  Each time, Castillo refused and reminded Hemphill that he had been hired to drive trucks, not to do construction, and that he was only authorized to work as a truck driver for KAH Transportes.

In mid-May 2015, Hemphill told Castillo that he didn't have any truck driving work for him that weekend, but that Castillo should report to the office the next morning for a landscaping job.  Castillo refused, again reminding Hemphill he was not authorized to work as anything other than a truck driver for KAH Transportes.  Hemphill told him to report to work the next morning anyway.  The next day, Castillo did not report to work.  Hemphill called Castillo and screamed at him, saying, according to the Underlying Complaint, "after I bring you here to work this is how you repay me?!"  Underlying Complaint ¶ 195.

Around the same time, Castillo informed Hemphill that he did not want to continue working for KAH Transportes.  Hemphill responded that Mr. Castillo could not leave because he had signed a contract with KAH Transportes to work until December 2015 and had to continue to work until that time.  Soon thereafter, Castillo informed Hemphill's secretary that he wished to return to Mexico and asked the secretary to arrange a flight for him.  Mariana Hemphill overheard the conversation and threatened Castillo.  According to the Underlying Complaint, she

told Castillo that he had a contract with KAH Transportes and could not return to Mexico; that

KAH Transportes sponsored his visa, which could be canceled at any time; and that they could

"close the doors" on the H-2B visa program to Castillo "forever."  Underlying Complaint ¶ 199.

Mariana Hemphill also told Mr. Castillo that she would call the police on him if he left their

employ.

Castillo did not have the money to pay for a return ticket to Mexico, so he continued to

work for KAH Transportes.  The Complaint alleges that in each subsequent paycheck, KAH

Transportes failed to pay Castillo for all of the hours he worked.  During this period, Hemphill

and his agents continued to force Castillo to work outside the bounds of his contract.  Castillo

continued to protest, telling Hemphill that he wished to leave his employ.  Hemphill again told

Castillo that they had a contract and that he could not leave.  Throughout, Hemphill or some

agent of Hemphill possessed Castillo's Mexican passport, H-2B visa, and U.S. Social Security

card.

On July 9, 2015, Castillo did not report to work with KAH Transportes.  That afternoon,

Hemphill sent Castillo a series of aggressive and accusatory text messages, suggesting that

Castillo had "used [KAH Transportes] to cross the border and live here illegally."  Underlying

Complaint ¶ 230(c).  After receiving those texts, Castillo called the National Human Trafficking

Hotline phone number, which was listed on a pamphlet provided to him by the U.S. consulate in

Hermosillo when he obtained his visa.  He informed the person who answered the phone that his

employer had threatened to call the police on him if he left his job.  The hotline referred Castillo

to Friends of Farmworkers—now known as Justice at Work—Castillo's current counsel.

The following day, according to the Underlying Complaint, Castillo went to the office to

pick up his paycheck.  Gabriela Orozco, the office manager, instructed Castillo to wait for

Hemphill.  When Hemphill arrived, he refused to provide Castillo his paycheck, the parties exchanged heated words, and Hemphill called the police.  The police arrived and arrested Castillo, charging him with trespass and terroristic threats.  Throughout the encounter, the officer spoke to Castillo in English, and Castillo contends he did not understand what the officer was saying.  The officer put Castillo in a police vehicle, took him to the Upper Darby police station, and placed him in a holding cell.

Castillo was arraigned that day and, after a coworker of Castillo paid a $500 bail bond the following day, Castillo was released.  Castillo went to his West Philadelphia housing but learned that Hemphill had ordered his roommates not to allow Castillo back in.  Nevertheless, a roommate left the back door open so Castillo could enter from the back door.  Castillo slept at the property that night.

Castillo informed his roommates that he intended to contact the Consulate of Mexico in Philadelphia to seek assistance.  His roommates warned him against it, reminding Castillo that Mariana Hemphill had contacts at the consulate and that Defendant Hemphill had contacts with local police.  On July 14, 2015, Castillo contacted the Consulate of Mexico in Philadelphia despite his roommates' misgivings, and the consulate secured a criminal defense attorney to represent Castillo.  Castillo's preliminary hearing was originally scheduled for July 22, 2015, but was continued three separate times until October 14, 2015.  Castillo did not receive the money owed to him by Defendants until the day of his criminal hearing.

Castillo's terroristic threat charge eventually was withdrawn after entering into a mutual release agreement with Hemphill.[5]  To avoid a conviction on the trespass charge, Castillo entered

---

[5] In the accompanying case, I found genuine disputes of material fact as to whether the mutual release agreement is enforceable because of unconscionability, and denied summary judgment to Hemphill and other defendants on that

the court's Accelerated Rehabilitative Disposition Program.  He was required to complete 12 months of probation and 32 hours of community service, and pay $1,532 in court costs, $200 in restitution, and monthly probation fees.

On these bases, on May 1, 2018, Castillo filed suit against Hemphill, MJC Labor, and various other corporate entities controlled by Hemphill alleging human trafficking and wage violations.  Landmark declined to provide a defense, and Hemphill and MJC Labor move this Court for a declaratory judgment that Landmark must do so.

**IV.     The Underlying Complaint did not trigger coverage**

In the sections that follow, I analyze whether the allegations in the Underlying Complaint should have triggered coverage for MJC Labor and Hemphill under the MPL policy.  I conclude that they do not.  In doing so, I first conclude that the counts as pled do not arise out of a negligent act, error, or omission in providing placement services to an employee.  Second, I reject Plaintiffs Hemphill and MJC Labor's contention that the Underlying Complaint states an implicit negligent misrepresentation claim that could have triggered coverage.  Third, I conclude that Landmark did not owe Plaintiffs a defense based upon a prior representation.

**A.  The pled causes of action do not arise out of a negligent act, error, or omission in providing placement services to an employee**

The Underlying Complaint alleges causes of action that fall into four categories— violations of federal and state anti-human trafficking laws; violations of federal and state wage laws; violations of Pennsylvania common law; and a violation of Pennsylvania consumer protection law.  No cause of action arose of out of a *negligent* act, error, or omission in providing

---

basis.  *See* Memorandum Denying Defendants' Motion for Summary Judgment, *Jose Enrique Castillo Chaidez v. Carl Hemphill, et al.*, No. 18-1837 (E.D. Pa. Nov. 15, 2019), ECF 35.

*placement* services to Castillo; rather, the Complaint focuses on purportedly *intentional* conduct *after* Mr. Castillo was placed.

**1.** ***The Federal and State Trafficking Counts.*** Counts I, II, and V allege violations of federal and state anti-human trafficking laws. Because each Trafficking Count requires the defendants to have acted knowingly, none could have "aris[en] out of a negligent act, error, or omission."

Count I alleges a violation of the federal Trafficking Victims Protection Act, 18 U.S.C. § 1581, *et seq.* It claims that "Employer Defendants," including Hemphill and MJC Labor, "knowingly threatened Plaintiff with serious harm in order to obtain [Castillo's] labor or services"; "knowingly abused and/or threatened to abuse the law or legal process, including the criminal justice system and the H-2B visa program, in order to obtain [Castillo's] labor or services"; and "knowingly, by means of a scheme, plan, or pattern intended to cause [Castillo] to believe that, if he did not perform labor or services, he would suffer serious harm or physical restraint."

Count III also alleges a violation of the federal Trafficking Victims Protection Act, 18 U.S.C. § 1581, *et seq.* It alleges that "Employer Defendants," including Hemphill and MJC Labor, "knowingly recruited, transported, harbored, provided, and/or obtained [Castillo] for the purpose of subjecting him to forced labor and involuntary servitude"; "recruited [Castillo] in Mexico with the intention of subjecting him to forced labor"; and "enticed [Castillo] to travel from Mexico by telling him that he would work as a truck driver full time between March 2015 and December 2015 with the legally required overtime pay rate for hours worked in excess of forty per week" but then "forced Plaintiff to do manual labor, attempted to force him to work for Employer Defendants' clients, did not pay him for all of the hours he worked, confiscated his

Mexican passport, H-2B visa and U.S. Social Security Card; and repeatedly refused to allow him to end the employment relationship."

Count V alleges a violation of Pennsylvania Act 105, 18 Pa. C.S. § 3051, the state's anti-human trafficking law.  It claims that Employer Defendants "participated in the human trafficking of Plaintiff"; "recruited and maintained [Castillo] knowing that he would be subjected to involuntary servitude"; "knowingly subjected Plaintiff to labor servitude" by various means; and "knowingly benefitted financially and received the value of [Castillo's] trafficking—namely, his labor and services."

Each of the Trafficking Counts requires the defendants to have acted knowingly, that is, aware or practically certain that their conduct would have resulted in certain consequences or cause a specific result.  Thus, for each, Castillo must prove by a preponderance of the evidence that the defendants acted with a culpable mental state far above mere negligence.  Accordingly, none of the Trafficking Counts or the facts alleged that support them arose from a negligent act, error, or omission.

**2. *The Federal and State Wage Violations*.**  Next, Counts IV, VII, and VIII allege violations of federal and state minimum wage and wage protection laws.  Because each Count arises from events that occurred after Castillo was admitted to the United States to work for KAH Transportes, none pertains to MJC Labor's or Hemphill's "performance of providing a permanent and/or temporary employee placement services."

Count IV alleges a violation of the federal Fair Labor Standards Act, 29 U.S.C. §§ 201-219.  It claims that "[a]t all times relevant to this case, Employer Defendants were [qualifying] employers"; "Defendants failed to pay Plaintiff the federal statutory minimum wage for all hours he worked during the time he was employed by Defendants"; "Defendants failed to pay Plaintiff

16

overtime pay for all hours he worked in excess of forty hours per week"; and "Employer Defendants made unlawful de-facto deductions from [Castillo's] wages for the H-2B visa fee and the transportation and lodging costs related to attending the visa interview, which were expenses incurred primarily for the benefit of Employer Defendants."

Count VII alleges a violation of Pennsylvania's Minimum Wage Act of 1968 ("MWA"), 43 P.S. §§ 333.101-115.  It claims that "Defendants acted intentionally, willfully, and with reckless disregard of clearly applicable MWA provisions" in "violat[ing] the MWA requirement that covered employees be compensated for every hour worked in a workweek and that they receive a minimum wage of not less than the federal minimum wage," and "violat[ing] the MWA requirement that employees receive overtime compensation 'not less than one and one-half times' the employee's regular rate of pay for all hours worked over 40 in a workweek."

Count VIII alleges a violation of Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1-260.12.  It claims that Employer Defendants "failed to pay [Castillo] for any work performed" during two pay periods, impermissibly "deduct[ed] from [Castillo's] wages for airfare," and "had no good faith reason for withholding any wages owed to [Castillo]."

These Counts cannot pertain to Hemphill's or MJC Labor's "performance of providing a permanent and/or temporary employee placement services" because each arose from events that occurred after Castillo was admitted to the United States, where he was working exclusively for KAH Transportes.  *See* Underlying Complaint ¶ 120.  Castillo signed his employment contract with KAH Transportes on February 18, 2015, two months before he arrived in the United States. *See* Defendants' Motion for Summary Judgment, *Jose Enrique Castillo Chaidez v. Carl Hemphill, et al.*, No. 18-1837 (E.D. Pa. July 15, 2019), ECF 27.  That contract set Castillo's

conditions of employment, salary, and hours, and detailed the tasks for which he would be responsible.  The contract also states clearly that "[t]he worker"—that is, Castillo—"is an employee of the Company"—that is, KAH Transportes—"and only [KAH Transportes] is authorized to supervise or control [Castillo]."  Finally, the contract notes that "[t]his instrument is the complete contract of [KAH Transportes] and [Castillo]."  In all, even if MJC Labor had some role to play in recruiting and hiring Castillo, that role ceased once KAH Transportes and Castillo entered into a contractual relationship.

In any case, the wage-related allegations do not involve the "performance" of "placement services," whether performed negligently or not.  The Underlying Complaint alleges that the Employer Defendants "did not pay Mr. Castillo for any of the work performed on April 20, April 21, or April 22, 2015," after he began working for KAH Transportes.  On those days, according to the Underlying Complaint, Castillo reported to work in the early morning and spent much of the day "in Employer Defendants' yard and offices" doing work including "picking trash out of yard debris that Employer Defendants' employees would later grind into wood chips." Underlying Complaint ¶¶ 144-45.

The Underlying Complaint also alleges that the Hemphill and his corporate entities "did not pay Mr. Castillo for all of the hours worked between April 23 and May 6, 2015."  On those days, according to the Complaint, Castillo was performing the job for which he contracted— "[driving] the truck to several locations in Southeast Pennsylvania to unload and load materials." Underlying Complaint ¶ 164.  Like for the manual labor for which Castillo was never compensated, Hemphill and his corporate entities' failure to fully compensate Castillo on these days has nothing to do with Castillo's "placement" in some employment role.  Castillo already had been placed with Hemphill and his conglomeration of companies, and was working.

18

The Underlying Complaint finally alleges that Hemphill "deducted rent for April and May 2015." Underlying Complaint ¶ 184. As stated, because Castillo already had been admitted to the country to work for KAH Transportes, he no longer was in the process of being "placed" in employment. Again, by the time he moved into the apartment for which the Employer Defendants deducted rent, Castillo already had signed an employment contract. *See* Underlying Complaint ¶¶ 122-23.

**3. *The State Common Law Counts*.** Next, Counts IX, X, and XI allege violations of state common law, and largely arise from the same factual predicates as the federal and state wage violations described in the previous subsection.

Count IX alleges common law breach of contract. It claims that "Employer Defendants collectively entered into a contract with [Castillo] and each party's acceptance was supported by good and valuable consideration," that "[Castillo] fulfilled his contractual obligations by traveling to the United States and laboring for Employer Defendants," but that "Employer Defendants breached the contract with [Castillo] by failing to pay contractually established wages for work performed by [Castillo] and to cover promised expenses."

Count X alleges common law unjust enrichment. It claims that "[b]y laboring for Employer Defendants, [Castillo] provided benefits to Defendants," that "[Castillo] expected to be compensated for the labor he provided to Employer Defendants," and that "Employer Defendants' unjust failure to pay [Castillo] prevailing wages for the labor performed constituted a distinct detriment to [Castillo]."

Both Counts are premised on the contractual relationship between Castillo and KAH Transportes, and allege harms stemming from Hemphill's failure to pay Castillo the wages he had earned. The terms of the contract dictated that Castillo had to work exclusively for KAH

Transportes.  As above, whatever role MJC Labor had in recruiting and hiring Castillo ceased by the choice of Hemphill once KAH Transportes and Castillo entered into a contractual relationship.

    **4. *The State Consumer Protection Count*.**  Finally, Count XI alleges a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 101-l-201-9.2.  It claims that Hemphill and his agents "deceiv[ed] [Castillo] about rental housing in which he would be living" by "charging [Castillo] fees to live in housing that was not operated in accordance with law, and that was uninhabitable due to, among other things, overcrowding and vermin infestation."  It also claims "[t]he actions of Defendants with respect to rental housing fees are also in violation of the Consent Order for Injunctive Relief entered in *Fuentes, et al. v. MJC Labor Solutions, et al.*, No. 2:07-cv-00980-RBS (E.D. Pa., Docket 51, Nov. 3, 2009)."

    Plaintiffs Hemphill and MJC Labor argue that because the Underlying Complaint does not "specifically allege" that the UTPCPL violation was "intentional," the "allegation also encompasses negligent misrepresentation."  ECF 1 ¶ 43.  That does not follow.  Much in the same way the Trafficking Counts require the defendants to have acted "knowingly," Castillo's UTPCPL Count alleges that Defendants "deceived" him concerning his living arrangements. Proving "deception" requires more than proving a negligent act, error, or omission.

    Further, the UTPCPL Count in the Underlying Complaint does not plead any facts concerning misrepresentation.  There are no allegations in the Complaint that Castillo would not have interviewed for the position if housing were not provided by the employer.  There are no allegations that when Castillo attended the job fair in Mexico he limited his employment search to those positions that provided housing options.  Indeed, there are no allegations whatsoever that

Hemphill or MJC Labor made representations to Castillo concerning his living conditions or that his employment was in any way conditioned on his acceptance of the rental housing.  Underlying Complaint ¶¶ 377-83.

In all, none of the pled causes of action in the Underlying Complaint arise out of a negligent act, error, or omission in providing placement services to Castillo.

### B.  The Underlying Complaint does not allege a negligent misrepresentation claim

Plaintiffs Hemphill and MJC Labor next argue that the allegations in the Underlying Complaint form an unpled claim for negligent misrepresentation.  *See* ECF 1 ¶ 39; ECF 19, at 22.  To state a viable claim for negligent misrepresentation, a plaintiff must allege "(a) a misrepresentation of material fact; (b) made under circumstances in which the misrepresenter ought to have known its falsity; (c) with an intent to induce another to act on it; and (d) which results in injury to a party acting in justifiable reliance on the misrepresentation."  *Bilt-Rite Contractors, Inc. v. Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005).

Plaintiffs Hemphill and MJC Labor assert that the Underlying Complaint states an implicit negligent misrepresentation claim regarding Castillo's start date, compensation, and living conditions.  *See* ECF 19, at 24.  Plaintiffs' allegation that Castillo pled a negligent misrepresentation claim concerning his living arrangements fails for the reasons previously stated—the housing-related causes of action in the Underlying Complaint do not allege any facts that Castillo relied upon a representation concerning housing to his detriment.

As to his start date, in the Underlying Complaint, Castillo does not seek redress for injuries caused by any misrepresentation concerning his start date.  *See, e.g.*, Underlying Complaint ¶¶ 369-70 (noting that "[Castillo] fulfilled his contractual obligations by traveling to the United States and laboring for Employer Defendants" but that "Employer Defendants

breached the contract with [Castillo] by failing to pay contractually established wages for work *performed* by [Castillo]" and, as a result "of Employer Defendants' breach of contract, Plaintiff suffered from a loss of expected wages and income") (emphasis added); *see also id.* ¶ 375 (noting that "[Castillo] expected to be compensated for the labor *he provided* to Employer Defendants") (emphasis added).[6]

### C.  Landmark does not owe a defense to MJC Labor or Hemphill based on a previous representation

Hemphill and MJC Labor finally argue that Landmark owes them a defense in the Castillo Action because they have a reasonable expectation of coverage under the MPL policy based upon Landmark having defended them in a similar action. *See* Declaratory Judgment Compl. ¶ 76.  In making this argument, however, Hemphill and MJC Labor misconstrue the reasonable expectation doctrine.

It is true, as Hemphill and MJC Labor claim, that "[t]he proper focus regarding issues of coverage under insurance contracts is the reasonable expectations of the insured." *Britamco Underwriters v. Weiner*, 636 A.2d 649, 651 (Pa. Super. Ct. 1994).  But insurance policies, like all contracts, "must be read as a whole and construed according to the plain meaning of its terms." *C.H. Heist Caribe Corp. v. Am. Home Assurance Co.*, 640 F.2d 479 (3d Cir. 1981).  Consequently, an insured "may not complain that its reasonable expectations have been frustrated when the applicable policy limitations are clear and unambiguous." *Millers Capital*

---

[6] My analysis here is limited to the content of the Underlying Complaint.  But to the extent that this requires consideration as to whether the allegations therein state a claim, it should be noted that because Mr. Castillo specifically cites his contract with KAH Transportes as the basis for the claims he brings, it is difficult to identify a colorable claim for negligence under Pennsylvania's economic loss or "gist of the action" doctrines.

*Ins. Co. v. Gambone Bros. Dev. Co.,* 941 A.2d 706, 717 (Pa. Super. Ct. 2007).  Thus, the initial

inquiry as to the reasonable expectation of an insured must begin with the language of the policy.

      Here, the express language of the MPL policy is the clearest manifestation of the parties'

expectations, and that language is not difficult to interpret.  Landmark promised to defend MJC

Labor and any qualifying agent for claims "arising out of a negligent act, error or omission . . . in

the rendering of or failure to render professional services."  Once armed with the express

language of the MPL policy, the task is to determine if there are sufficient allegations in the

Underlying Complaint to trigger coverage under the terms of the MPL policy.  I conducted that

analysis in the subsections above, concluding that neither the pled causes of action in the

Underlying Complaint nor an implicit negligent misrepresentation claim triggered coverage

under the terms of the MPL policy.[7]

---

[7] In correspondence  before this action was filed, attached as exhibits to the Complaint, the parties argued over coverage by estoppel at some length.  Plaintiffs do not appear to argue that now, but in any event such a theory would not prevail. Under Pennsylvania law, to find an estoppel, "there must be such conduct on the part of the insurer as would, if the insurer were not estopped, operate as a fraud on some party who has taken or neglected to take some action to his own prejudice in reliance thereon."  *Wasilko v. Home Mut. Cas. Co.*, 232 A.2d 60, 63 (Pa. Super. Ct. 1967).  However, "an insurer is not estopped to deny liability on a policy where the [insured] was not misled by the [insurer's] conduct."  *Id.*  Thus, to demonstrate an estoppel, Hemphill and MJC would have to establish "(1) an inducement whether by act, representation, or silence when one ought to speak, that causes one to believe the existence of certain facts; (2) justifiable reliance on that inducement; and (3) prejudice to the one who relies if the inducer is permitted to deny the existence of such facts."  *West Chester Univ. Foundation v. MetLife Ins. Co. of Connecticut*, 259 F. Supp. 3d 211, 222 (E.D. Pa. 2017) (quoting *Carlson v. Arnot-Ogden Mem'l Hosp.*, 918 F.2d 411, 416 (3d Cir. 1990)).  Here, Landmark never suggested to MJC Labor or Hemphill that its coverage of them in the previous action would cause it to cover them in future actions, however similar.  Indeed, even when Landmark agreed to defend MJC Labor and Hemphill in the previous action, it did so "subject to a complete reservation of rights," including the right to "withdraw its defense of MJC [Labor]" if its "investigation revealed that no coverage was owed to MJC [Labor] under the [MPL] Policy."  ECF 1, Ex. 4 (at PDF p. 171).  That reservation of rights is more than enough to permit Landmark to reverse a coverage decision under the MPL Policy.  As the Pennsylvania Superior Court long ago made clear, "an insurer will not be estopped" from denying coverage, "notwithstanding the insurer's participation in the defense of an action against the insured, if the insurer gives timely notice to the insured that it has not waived the benefit of its defense under the policy."  *Brugnoli v. Un. Nat'l Ins. Co.*, 426 A.2d 164, 167 (Pa. Super. Ct. 1981).  If it would have been  legally permissible for Landmark to withdraw its defense of MJC Labor in the previous action even after it agreed to defend, it certainly may decline to extend coverage here in the first instance.

The reasonable expectations doctrine can also apply even if the language of a policy is unambiguous, but only where the insurer has unilaterally made a change in coverage that misleads the policy holder.  *Downey v. First Indem. Ins*., 214 F. Supp. 3d 414, 424 (E.D. Pa. 2016) (Goldberg, J.).  Landmark declined coverage here solely on the basis of the policy as worded.[8]

### D.  Because Landmark's decision to deny coverage was proper, Plaintiffs fail to state a claim for bad faith

Plaintiffs also allege that Landmark has acted in bad faith.  ECF 1, at 25-43.  Because I have concluded that Landmark acted in accordance with the terms of the policy, it cannot be deemed to have acted in bad faith.

## V.   Conclusion

For the reasons set forth above, Defendant's Motion to Dismiss will be granted.  An appropriate Order follows.

     /s/ Gerald Austin McHugh
United States District Judge

---

[8] In its reply brief, Landmark argues that Hemphill and MJC Labor's "reasonable expectations argument is improper as a defense to Landmark's Motion to Dismiss" because they "do not allege a claim based on the reasonable expectations doctrine in their Complaint or even allege that the Landmark Policy is ambiguous."  ECF 20, at 13.  It appears that Plaintiffs Hemphill and MJC Labor did allege the reasonable expectations doctrine in their Declaratory Judgment Complaint.  *See, e.g.*, ECF 1 ¶ 76.  Nevertheless, because I concluded that the parties' reasonable expectations do not upset any analysis dictated by the MPL policy's express terms, I need not reach that argument.